UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PAMELA F. S.[1]

                    Plaintiff,

        v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

                  Defendant.

Case No. 3:19-cv-1678-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

       Plaintiff Pamela F. S. ("Plaintiff") filed this action under section 205(g) of the Social

Security Act ("Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security ("Commissioner") who denied her social security disability

insurance benefits ("Benefits"). The court finds the decision is not supported by substantial

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of
the non-governmental party in this case.

PAGE 1 - OPINION AND ORDER

evidence in the record.  Accordingly, the Commissioner's final decision is reversed and remanded for further proceedings.[2]

*Procedural Background*

On or about January 16, 2016, Plaintiff filed an application for Benefits alleging an onset date of March 11, 2016.  The application was denied initially, on reconsideration, and by the Administrative Law Judge ("ALJ") after a September 28, 2016 hearing ("Hearing").  The Appeals Council considered additional evidence offered by Plaintiff, found the new evidence did not show a reasonable probability it would change the outcome of the decision, and denied review.  As a result, the ALJ's decision became the final decision of the Commissioner.

*Factual Background[3]*

Plaintiff is sixty-three years old.  She graduated from college with a bachelor's degree in business administration.  Her past relevant work experience is as a paralegal.  Plaintiff has not been involved in a successful work attempt since March 11, 2016.  She alleges disability because of spasmodic torticollis, depression, primary fibromyalgia syndrome, and sleep apnea.  She meets the insured status requirements entitling her to Benefits through December 31, 2020.

I.  Testimony

In a Function Report dated April 12, 2016, Plaintiff described her average day as follows: "I go to the pool in the mornings to exercise.  I go to doctor or physical therapy appointments. Usually take a nap in the afternoon.  I watch tv and play games on my iPad.  It is difficult to sit for

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).
[3] Plaintiff asserts the ALJ erred when considering limitations relating to her fibromyalgia and resulting difficulties with concentration due to "fibro-fog," fatigue, and exhaustion.  Consequently, the court concentrates its review on medical evidence relating primarily to these limitations.

a long time so I have to change positions often or lay in my bed to get comfortable."  (Tr. of Social Security Administrative R., ECF No. 11 ("Admin. R."), at 232.)  Plaintiff reported her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, and concentrate.  (Admin. R. at 236.)  She could not lift more than five pounds, sit more than ten-to-fifteen minutes, or walk more than a quarter mile without increased pain and got dizzy when bending.  (Admn. R. at 236.)  She did not have trouble paying attention but sometimes had "mental fogginess" and difficulty with reading comprehension.  (Admin. R. at 236.)  Specifically, Plaintiff stated she had "difficulty with mental fogginess and ability to concentrate" on some days, and her reading comprehension had suffered due to extreme fatigue from difficulty sleeping at night.  (Admin. R. at 231.)

Plaintiff cared for her elderly parents, paid their bills and handled their mail; fed and watered her cats and chickens; did light housework, including dishes and laundry, a few times a week for five to ten minutes; and shopped for clothes and groceries once or twice a week for about an hour but could not do yard work or vacuum.  (Admin. R. at 232, 234.)  She had difficulty putting on a shirt or coat, fastening her bra, and washing and drying her hair due to increased pain.  (Admin. R. at 233.)  She took fewer baths or showers, ate simple meals, such as shakes, omelets, sandwiches and cereal, and set reminders for medications.  (Admin. R. at 233.)

At the Hearing, Plaintiff testified she took medical leave from her paralegal job in March 2016 and never returned.  (Admin. R. at 55-56.)  Prior to taking leave, Plaintiff worked from home for a few years and at the time of the Hearing, was working part-time on temporary basis.  (Admin. R. at 57-58.)  Plaintiff worked primarily in the mornings when she had the most energy and spent the afternoon lying in bed playing on her iPad, listening to a book, or taking a nap.  (Admin. R. at

75.)  When she worked at the computer for extended periods, she had difficulty concentrating, felt like she had "cobwebs" in her brain, and needed to take a break.  (Admin. R. at 76.)

Plaintiff indicated she has suffered from a pain syndrome since diagnosed with fibromyalgia in 2000 and from depression since college.  (Admin. R. at 61-62.)  A combination of Wellbutrin and Prozac "works best" for her depression and she takes Naltrexone as needed for her pain.  (Admin. R. at 63-65.)  She has a headache virtually every morning, for which she takes over-the-counter pain medications.  (Admin. R. at 66.)  Other than some wrist pain from holding the steering wheel, Plaintiff had no difficulty driving the hour and half to her parent's house.  (Admin. R. at 70.)  Long-term walking increased her pain but "aqua jogging" in the water "help[ed] a lot with [her] symptoms."  (Admin. R. at 71.)  She described herself as "generally, sad and tired" but enjoyed quilting, which she did once a week at her sister-in-law's house and once a month at both Quilts of Valor and Passage Quilts, even though it was painful to sit at the sewing machine for a couple hours.  (Admin. R. at 72.)  She lived with her husband, who was retired, and their two cats.  (Admin. R. at 55-56.)  Plaintiff's husband did a lot of the shopping and laundry but mostly watched television.  (Admin. R. at 59.)

Plaintiff still assisted her elderly parents by paying their bills, providing general emotional support, and helping them with their computer and other technology.  (Admin. R. at 70.)  She also traveled with her sister and parents, both nationally and internationally, and participated in bus or ship activities including tape-assisted walking tours.  (Admin. R. at 60.)  Each traveler carried their own bag and Plaintiff's parents occasionally used wheelchairs in airports or museums.  (Admin. R. at 68-69.)

\ \ \ \ \

\ \ \ \ \

PAGE 4 - OPINION AND ORDER

## II.  Medical Evidence

### A.  Treating Physicians

Plaintiff sought treatment from Christopher Ginocchio, M.D. ("Dr. Ginocchio"), in early 2016 with respect to symptoms of involuntary left head turning and pulling.  (Admin. R. at 494.) In treatment notes dated January 14, 2016, Dr. Ginocchio reported no tenderness or pain and normal range of motion in Plaintiff's cervical spine, back, and low back; normal muscle bulk and tone, range of motion, and motor exam of Plaintiff's extremities; normal sensation to vibration and light touch; normal finger to nose coordination and normal fine motor movements; and some deficiencies in her reflexes.  (Admin. R. at 405-06.)  He observed her gait and stance to have a normal base, stride, and arm swing, and her heel walk, toe walk, and tandem gait were normal as well.  (Admin. R. at 406.)  He described her "Mental Status" as oriented to person, place, problem, and time, with an appropriate mood and affect, spontaneous speech, and grossly intact memory. (Admin. R. at 405.)  Dr. Ginocchio diagnosed Plaintiff with spasmodic torticollis, cervical radiculopathy, and primary fibromyalgia syndrome, recommended botox treatment for the torticollis and a neuropathic pain medication for the fibromyalgia, and noted Plaintiff was additionally treating her fibromyalgia by using a CPAP machine for her sleep apnea, taking medication for her depression, and staying physically active with her water aerobics.  (Admin. R. at 406.)

On February 9, 2016, Dr. Ginocchio reported Plaintiff recently returned from a two-week vacation in Mexico and experienced improvement in her right shoulder pain with a steroid injection, gabapentin, and physical therapy.  (Admin. R. at 412.)  He indicated an MRI of Plaintiff's cervical spine revealed "[m]ild degenerative disc disease most prominent at C7 and also a little bit of loss of cervical lordosis but certainly no significant neural foraminal narrowing," a nerve

conduction test of her right upper extremity was normal, and an electromyography of her right arm, shoulder, and cervical paracervical muscles was "normal with no evidence to suggest a cervical radiculopathy or myopathy." (Admin. R. at 412-13.)  As a result, Dr. Ginocchio retracted his diagnosis of cervical radiculopathy and added a diagnosis of adhesive capsulitis of Plaintiff's right shoulder. (Admin. R. at 413.)  Plaintiff returned to Dr. Ginocchio the next day for a botox injection. (Admin. R. at 414, 416.)

On March 8, 2016, Plaintiff complained to Dr. Ginocchio of increased headaches and fatigue. (Admin. R. at 420.)  Plaintiff reported "having a much more difficult time at work.  She is making mistakes because she feels that she does not have the clarity of thought.  She is fatigued and her brain feels a bit foggy.  She works as a paralegal and this is impairing her ability to take care of jobs that she would normally enjoy doing.  She feels her reading comprehension has declined a little bit." (Admin. R. at 420.)  On exam, Plaintiff again appeared oriented to person, place, problem, and time, with an appropriate mood and affect, spontaneous speech, and grossly intact memory. (Admin. R. at 420.)  However, based on Plaintiff's opinion "the effort associated with the counteracting her spasmodic torticollis has been the 'straw that broke the camel's back' with regard to her overall level of function at work," Dr. Ginocchio completed FMLA and short-term disability paperwork in the hope "that giving her some time to 'recover and heal' and get used to the botox treatments will allow her to restart her work with vim and vigor." (Admin. R. at 420, 422.)  He also advised Plaintiff that many of her current symptoms – her "fibro-fog, fatigability, and overall sense of exhaustion" – are related to her fibromyalgia and she would likely benefit from a referral to a fibromyalgia center. (Admin. R. at 421.)  Dr. Ginocchio gave Plaintiff a second Botox injection on May 11, 2016, and expressed "delight" Plaintiff had an appointment at a fibromyalgia clinic in June 2016. (Admin. R. at 688-89.)

PAGE 6 - OPINION AND ORDER

During an initial visit on May 16, 2016, for treatment related to Plaintiff's depression, Howard Rosenbaum, M.D., noted Plaintiff was "alert and oriented," her "memory and concentration are within normal limits," and her "insight and judgment are fair." (Admin. R. at 707.) On June 1, 2016, Carrie A. Schreibman, F.N.P., with the fibromyalgia clinic, diagnosed Plaintiff with "moderate fibromyalgia pain and dysfunction," described available therapies, such as physical therapy, medications, and acupuncture, which Plaintiff may need to alternate, and referred her to a fibromyalgia website. (Admin. R. at 785.)

Plaintiff initiated care with Kaiser Permanente in early 2018, where Lisa A. Leavitt, M.D. ("Dr. Leavitt"), served as her primary medical provider. (Admin. R. at 1104, 1114.) At that time, Plaintiff reported she was taking medications on a regular basis for osteoporosis, vaginal dryness, and depression, and on an as-needed basis for nausea and anxiety/sleep. (Admin. R. at 1110.) During the initial examination on January 22, 2018, Dr. Leavitt observed no obvious neurological defects, fluent speech, and normal mood and affect. (Admin. R. at 1115.) From January 2018 to May 2018, Dr. Leavitt interacted with Plaintiff primarily for the purpose of adjusting her medications. (Admin. R. at 1121, 1123, 1150-51.) In June 2018, Plaintiff sought assistance from Dr. Leavitt with pain management. (Admin. R. 1163.) Plaintiff reported her "symptoms of fibro tend to get better in the summer," she felt tired and had little energy nearly every day and had trouble with concentration more often than not. (Admin. R. at 1163-64.) Dr. Leavitt again observed no obvious neurological defects, fluent speech, and normal mood and affect. (Admin. R. at 1164.) Dr. Leavitt recommended a change of medication from Tramadol to a trial with Naltroxene, which was eventually successful with adjustments to daily dosage. (Admin. R. at 1164-65, 1174, 1179.) Dr. Leavitt responded to an email from Plaintiff with respect to Plaintiff's

PAGE 7 - OPINION AND ORDER

medications in July 2018 but, according to the medical records, did not have any other interactions with Plaintiff through the end of the year.  (Admin. R. at 1176.)

In a letter dated December 17, 2018, provided to the Appeals Council after the ALJ issued his decision, Dr. Leavitt identified Plaintiff's active and chronic problems as moderate adult obstructive sleep apnea, neck pain, vertigo, torticollis, tension headaches, insomnia, recurrent episodes of mild major depressive disorder, and fibromyalgia.  (Admin. R. at 21.)  She stated: "These issues cause neck pain, fatigue, poor concentration, headaches, and other types of pain such as back pain that prohibit her from daily tasks."  (Admin. R. at 21.)  Two days later, Dr. Leavitt completed a report in which she represented Plaintiff suffered from "fibromyalgia, torticollis, chronic neck pain with intermittent cervical radiculopathy, MDD (recurrent)" and opined Plaintiff's symptoms would often be severe enough to interfere with attention and concentration, but indicated Plaintiff was capable of low stress jobs.  (Admin. R. at 14-15.)  She indicated Plaintiff's physical limitations would cause her to be absent from work more than four times a month.  (Admin. R. at 18.)

### B.  Examining Physician

At the request of the Commissioner, Daniel L. Scharf, Ph.D. ("Dr. Scharf"), reviewed Plaintiff's medical records and physically examined Plaintiff with respect to her chronic depression, chronic pain, and anxiety on July 11, 2016.  (Admin. R. at 761.)  Dr. Scharf noted Plaintiff was "primarily focused on her difficulties with pain and fatigue as her main barriers to working."  (Admin. R. at 761.)  He observed Plaintiff "was easily able to participate in the interview portion of the examination.  She was able to answer questions appropriately, recall events, and track the conversation." (Admin. R. at 761.)  When asked about fibromyalgia, Plaintiff reported she was first diagnosed in 2000 and estimated her pain level to average between seven

PAGE 8 - OPINION AND ORDER

and eight on a pain scale of one to ten, with her current pain level at a seven. (Admin. R. at 762.)

Dr. Scharf indicated Plaintiff "did not show observable signs of pain behavior during the

examination." (Admin. R. at 761.) Plaintiff also complained about chronic fatigue, which was

then at a level of five, but Dr. Scharf did not observe any signs of fatigue during the examination.

(Admin. R. at 762.) With respect to work, Plaintiff explained she worked as a paralegal but quit

her job because "she felt she was missing too much work for medical appointments and wanted to

focus on her health. She said she was generally able to do the duties of the job but reported that

she was making more errors. . . . The claimant reported she typically caught the errors and

corrected them." (Admin. R. at 762.) Plaintiff also reported she was "able to dress herself and

complete her hygiene," did light housework and laundry about once a week, cooked basic meals

at times, managed her money, and drove. (Admin. R. at 763.)

> Dr. Scharf summarized his mental examination of Plaintiff in the following manner:
>
> This is a 59-year-old woman who was casually dressed with adequate grooming. She generally provided information with prompting. The quality of her speech was clear and articulation and easily understandable. She was correctly oriented to person, place, time, and purpose. Thoughts were logical and goal-directed. There are no signs of major psychopathology such as hallucinations, delusions, or preoccupations. Her affect was within normal limits and mood varied from being happy to somewhat dysphoric. Several times she laughed and smiled. Twice during the examination she was somewhat tearful when talking about her difficulties.
>
> The claimant was able to name the current president and the presidents to Bush Sr. She correctly identified the capital city of Oregon and the states which border Oregon. She quickly and efficiently solved basic math operations in addition, subtraction, multiplication, and division. Attention and concentration were intact on MSE tasks. She recited the days of the week backwards in four seconds and the months backwards in 13 seconds which are normal performances. She recalled four of four objects immediately on one presentation and three of four objects after a five-minute delay. She interpreted the proverb you can't judge a book by its cover by saying "it's like a first impression kind of thing". She correctly completed a basic three-step instruction.

(Admin. R. at 763.)  He then diagnosed Plaintiff with persistent depressive disorder and concluded:

> Ms. Spang is able to manage her benefit funds if awarded.  She reported consistent depression which was somewhat evident on examination today.  She did not describe significant symptoms of anxiety.  The claimant reported having chronic pain and chronic fatigue which were not evident today during the examination.  She was able to understand and remember instructions.  The claimant was able to sustain concentration and attention and likely would have difficulties with persistence and her attention after 1 to 2 hours.  She generally is able to engage in appropriate social interaction.

(Admin. R. at 763-64.)

*C.  Reviewing Physicians*

Winifred C. Ju, Ph.D. ("Dr. Ju"), reviewed Plaintiff's medical records and on July 18, 2016, opined Plaintiff suffered from a severe affective disorder secondary to her spine disorder and found Plaintiff's mental impairment resulted in no restrictions in activities of daily living or repeated episodes of decompensation and only mild difficulties in maintaining social functioning, concentration, persistence, or pace.  (Admin. R. at 92-93.)  Joshua J. Boyd, Psy.D. ("Dr. Boyd"), another reviewing physician, agreed with the restrictions identified by Dr. Ju but characterized Plaintiff's affective disorder as "non severe" in a report dated September 20, 2016.  (Admin. R. at 110.)

III.  Vocational Evidence

Paul Morrison, impartial vocational consultant ("Morrison"), appeared at the Hearing, classified Plaintiff's paralegal work in general as skilled, light work with an SVP of seven but sedentary as performed by Plaintiff.  (Admin. R. at 78.)  The ALJ asked Morrison if a hypothetical individual of Plaintiff's advanced age, education, and work experience able to perform at a modified light duty exertional level with the ability to drive and additional restrictions of occasional climbing, stooping, crawling, kneeling, and overhead reaching, and no exposure to

hazards could perform Plaintiff's past work as actually or generally performed. (Admin. R. at 78-79.) Morrison testified such an individual would be able to perform Plaintiff's past work as a paralegal. (Admin. R. at 79.) When the ALJ added the additional restrictions of extra rest breaks totaling an hour during an eight-hour workday or at least two absences a month on a regular and random bases, Morrison opined such individual would not be able to maintain competitive employment in any capacity. (Admin. R. at 79.) In response to a question posed by Plaintiff's counsel, Morrison indicated an individual who was not able to concentrate for one-third of the workday would not be able to work as a paralegal or in any other capacity. (Admin. R. at 82-83.)

IV.  ALJ Decision

The ALJ found Plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar spine, spasmodic torticollis, obstructive sleep apnea, and fibromyalgia, and that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 11, 2016. (Admin. R. at 33.) While conceding Plaintiff's impairments limited her ability to perform basic work activities, the ALJ found such impairments did not meet or equal the severity of any listed impairment. (Admin. R. at 33, 36.) As a result of her impairments, the ALJ determined Plaintiff retained the ability to drive, was capable of performing light work that required only occasional climbing, stooping, crouching, kneeling, crawling, and reaching overhead, and should avoid concentrated exposure to hazards. (Admin. R. at 37.) Despite these limitations, the ALJ deemed Plaintiff capable of performing the physical and mental demands of her past relevant work as a paralegal. (Admin. R. at 40.)

The ALJ considered Plaintiff's "medically determinable mental impairments of depression and anxiety" with respect to the four broad areas of mental functioning commonly referred to as the "paragraph B" criteria. (Admin. R. at 34.) The ALJ found Plaintiff had no limitation in the

PAGE 11 - OPINION AND ORDER

first area of "understanding, remembering, or applying information," third area of "concentrating, persisting, or maintaining pace," and fourth area of "adapting or managing oneself," and a mild limitation in the second area of "interacting with others." (Admin. R. at 34-35.) As a result, he found Plaintiff's mental impairments to be "nonsevere." (Admin. R. at 35.) In assessing Plaintiff's ability to concentrate, persist, and maintain pace, the ALJ found Plaintiff remained able "to complete her activities of daily living including working part-time in a skilled position, driving, shopping, household chores, cooking, vacationing, and using a computer" as well as "paying bills, counting change, and savings account management." (Admin. R. at 35.) The ALJ also noted "[m]edical professionals on a consistent basis describe the claimant as alert and oriented" and Plaintiff's "memory, concentration, insight, and judgment have been described as within normal limits." (Admin. R. at 35.)

The ALJ then considered Plaintiff's mental impairments in the context of her residual functional capacity and concluded such impairments did not result in any appreciable limitations. The ALJ specifically identified the physicians' assessments opinions on which he relied in reaching this conclusion and the weight afforded each, as follows:

> The undersigned has given great weight to the State Agency (DDS) mental assessments completed by Winifred C. Ju, Ph.D., at the initial level and Joshua Boyd, Psy.D., at the reconsideration level. Both doctors opined after reviewing the medical evidence that the claimant does not have a severe mental impairment. Specifically, both doctors opined that the claimant is no more than mildly limited within the four areas of mental functioning. Although the former B criteria was used; this criteria can be generally applied to the updated B criteria as set forth in the current mental listings. Overall, the undersigned finds that the claimant does not have a severe mental impairment. Treatment records over a longitudinal period document that the claimant is alert, oriented, not in distress, with normal mood and affect, and with memory and concentration within normal limits. When further considering the claimant's employment, which was skilled, ended because of physical limitation, the undersigned does not find support for a severe mental impairment. When further considering the claimant began working again (same job) on a part-time basis and is successful, the undersigned does not find support that the claimant has a severe mental impairment. Accordingly, great weight has been given to the DDS mental assessments.

> Great weight has been given the opinion of Daniel Scharf, Ph.D., who completed a psychological diagnostic examination. Dr. Sc[h]arf[] noted that the claimant was easily able to participate in the interview, able to answer questions appropriately, recall remote events, track the conversation, and showed no signs of fatigue. Dr. Scharf noted that the claimant, despite complaints of pain, showed no signs of pain behaviors. Dr. Scharf noted that the claimant self-reported no disciplinary actions, when she did work. Dr. Scharf described the claimant as casually dressed with adequate grooming. When conversing, the claimant was clear, articulate, and easy to understand. The claimant was alert, oriented, logical, and goal directed. Mood and affect were also described as normal. Dr. Scharf noted that the claimant did not describe significant symptoms from a mental perspective but asserted to chronic pain and chronic fatigue, which were both "not evident" during the examination. The undersigned has given great weight to the opinion of Dr. Scharf because he personally evaluated the claimant and specializes in mental health assessments. Moreover, the longitudinal record supports the assertion that the claimant is no more than minimally limited from a mental perspective; the Claimant's employment ended for physical reasons (pain). Moreover, medical professionals during the period deliberated consistently described the claimant as alert, oriented, not in distress, and with appropriate mood and affect. Additionally, no medical provider has observed issues with memory or concentration. Accordingly, great weight has been given to the opinion of Dr. Scharf.

(Admin. R. at 36-37 (internal citations omitted).)

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Admin. R. at 38.) The ALJ characterized Plaintiff's subjective complaints, which included the inability to lift more than five pounds or sit for more than fifteen minutes, and "great difficulty with the completion of basic activities including dressing, bathing, driving, cooking, and cleaning," as "extreme." (Admin. R. at 38-39.) He found the medical opinions and treatment records "do not substantiate these subjective complaints." (Admin. R. at 38.) He also found:

> The claimant's activities of daily living further detract from her testimony. The claimant testified that she stopped working as a result of her physical impairments, particularly because of pain. However, within one year of the alleged onset date (the date the claimant stopped working), she took an extended international vacation. The undersigned notes, international travel entails walking, prolonged sitting,

PAGE 13 - OPINION AND ORDER

lifting/carrying/pulling of luggage as well as other various physical demands. The undersigned finds that the claimant's ability to travel does detract from the reliability of her testimony. In addition to traveling, the claimant spends her days at the local pool socializing and swimming. Additionally, the claimant drives, shops, cooks, completes household chores, and even assists her elderly parents. Overall, the claimant's activities of daily living further support that the claimant is far more functional then what has been alleged.

(Admin. R. at 38 (internal citations omitted).)

*Standard of Review*

The Act provides for payment of Benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2019). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A) (2019). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A) (2019).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either Benefits because he or she is disabled. 20 C.F.R. § 404.1520 (2019); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of

impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past.  If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied. 20 C.F.R. § 404.1520(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy considering his or her age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).  The claimant is entitled to Benefits only if he or she is not able to perform other work. 20 C.F.R. § 404.1520(f).

When an individual seeks Benefits because of disability, judicial review of the Commissioner's decision is guided by the standards set forth in 42 U.S.C. § 405(g).  The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).  "Substantial evidence"

PAGE 15 - OPINION AND ORDER

means "more than a mere scintilla, but less than a preponderance." *Robbins* v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005).  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).  In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. § 404.1545(a)(3) (2019); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996).  The reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).  However, a reviewing court may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

\ \ \ \ \

\ \ \ \ \

PAGE 16 - OPINION AND ORDER

*Discussion*

Plaintiff asserts the ALJ erred by failing to consider all evidence relating to her mental limitations caused by her fibromyalgia, taking administrative notice of the strenuous nature of Plaintiff's international travels without giving Plaintiff an opportunity to challenge the noticed facts, and including travel as an activity of daily living. Plaintiff asks the court to enter an order reversing the Commissioner's final decision and remand "the matter for a determination that is consistent with legal norms and free of harmful error." (Pl.'s Opening Br., ECF No. 16, at 31.) The Commissioner contends the ALJ properly considered the evidence in accordance with the terms of the Act and related regulations, and the decision should be affirmed.

I.  International Travel

*A. Administrative Notice*

The ALJ found Plaintiff's international travel was an activity of daily living that detracted from her reported symptoms and limitations. He expressly noted "international travel entails walking, prolonged sitting, lifting/carrying/pulling of luggage as well as other various physical demands." (Admin. R. at 38.) Plaintiff asserts the ALJ's use of the term "note" establishes he was taking administrative notice of the physical demands of international travel. However, it is evident from the record the ALJ's conclusion was substantially supported by Plaintiff's reports to her physicians and her testimony at the Hearing.

The record makes clear Plaintiff regularly enjoyed international vacations and reveals that she apparently went on three international vacations and a cruise near the time she took medical leave from work. In December 2014, Plaintiff reported to Sean Green, M.D., she traveled "extensively, recently traveling to Mexico, Ireland, England, Norway, Sweden, Denmark, Germany, and the Netherlands." (Admin. R. at 527.) In February 2016, she described her recent annual two-

week trip to Mexico to Judith L. Pulliam, LCSW ("Pulliam") as "good and relaxing."  (Admin. R. at 572, 577, 579.)  On March 23, 2016, a provider with David Sleman Chiropractic PC reported Plaintiff was "leaving for a cruise next month."  (Admin. R. at 839.)  Finally, Pulliam noted in April 2016 that Plaintiff was traveling to Paris with her parents and sister.  (Admin. R. at 567.)  When describing her travel to the ALJ at the Hearing, Plaintiff indicated she was responsible for carrying, and implied she was lifting or pulling, her own luggage.  She walked on self-guided tours and in museums, and in all but the largest airports.  She traveled by airplane and, accordingly, was required to sit for prolonged periods.  Consequently, the ALJ did not take administrative notice of the general rigors of international travel, but based his conclusion on Plaintiff's description of her travels and activities.  Thus, he did not err in this regard.

### B.  Plaintiff's Subjective Testimony

Even assuming the ALJ erred by taking administrative notice of the physical rigors of international travel without providing Plaintiff notice and an opportunity to respond, an ALJ needs only one valid reason for rejecting a claimant's subjective testimony with respect to symptoms and resulting limitations.  See *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ's decision to discredit symptom testimony may be upheld where specific justification not upheld if ALJ provided other valid rationale).  Here, the ALJ identified inconsistent treatment records and other activities of daily living as additional grounds for discounting Plaintiff's testimony.

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis.  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (2019).  The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).  At the second stage, absent affirmative

evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony. *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2013); *Tommasetti*, 533 F.3d at 1039. "Credibility determinations are the province of the ALJ" and the court may not "second-guess" the ALJ's determination if the ALJ has made specific findings that are supported by substantial evidence in the record. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). The overall credibility decision may be upheld even if not all of the ALJ's reasons for rejecting a claimant's testimony are upheld. *Batson*, 359 F.3d at 1197.

The ALJ found Plaintiff's "medically determinable impairments reasonably could be expected to cause some of the alleged symptoms" and did not identify any evidence to establish Plaintiff was malingering. (Admin. R. at 38.) Consequently, the ALJ was required to offer clear and convincing reasons for rejecting Plaintiff's testimony with regard to the limitations supported by objective evidence. To meet this standard, "[t]he ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints – '[g]eneral findings are insufficient.'" *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (*en banc.*) ("[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.").

PAGE 19 - OPINION AND ORDER

The ALJ stated "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Admin. R. at 38). The Ninth Circuit has expressly held a boilerplate statement such as this, without more, "falls short of meeting the ALJ's responsibility to provide 'a discussion of the evidence' and 'the reason or reasons upon which' his adverse determination is based." *Treichler v. SSA*, 775 F.3d 1090, 1103 (9th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)); *Brown-Hunter*, 806 F.3d at 493 (ALJ's finding that limitations identified by claimant were less serious than alleged based on unspecified claimant testimony and a summary of medical evidence insufficient to meet clear and convincing standard). Here, however, the ALJ engaged in additional discussion of the evidence and reasons for discounting Plaintiff's testimony.

The ALJ found Plaintiff's description of her daily activities to be inconsistent with her testimony regarding her functional limitations. An ALJ may use a claimant's daily activities to reject her subjective symptom testimony on either of two grounds: (1) if the reported activities contradict the claimant's other testimony; or (2) if the activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The ALJ was justified in discrediting Plaintiff's subjective testimony as contradictory of her physical limitations.

The ALJ found "[t]he claimant's activities of daily living further detract from her testimony" noting Plaintiff "spends her days at the local pool socializing and swimming . . . drives, shops, cooks, completes household chores, and even assists her elderly parents." (Admin. R. at 38.) He opined this activity is contradictory to Plaintiff's claims she is "unable to lift more than five pounds, sit for more that 10 to 15 minutes, and [has] great difficulty with the completion of basic activities including dressing, bathing, driving, cooking, and cleaning." (Admin. R. at 38.)

PAGE 20 - OPINION AND ORDER

While some could view Plaintiff's reports of her daily living activities as somewhat consistent with the limitations she describes, the evidence also supports a finding to the contrary. The ALJ is responsible for determining credibility and where evidence exists to support the ALJ's finding, the court may not substitute its own judgment or second guess the ALJ. The court finds the ALJ properly discounted Plaintiff's testimony as inconsistent with her description of her activities of daily living.

The ALJ also discounted Plaintiff's testimony based, in part, on medical evidence he considered inconsistent with the claimed severity of Plaintiff's limitations. As explained above, the ALJ may engage in ordinary techniques of assessing a witness's credibility "such as weighing inconsistent statements regarding symptoms by the claimant." *Smolen,* 80 F.3d 1284. Thus, it is not legally impermissible to give a claimant's testimony reduced weight because that testimony contradicts the objective medical evidence in the record. *Id.* However, the ALJ may not "make a negative credibility finding 'solely because' the claimant's symptom testimony 'is not substantiated affirmatively by objective medical evidence.'" *Stockwell v. Colvin,* No. 3:13–cv–01220–HZ, 2014 WL 6064446, at *3 (D. Or. Nov. 11, 2014).

The ALJ specifically noted "treatment records consistently document normal gait, no deformities, normal stance, normal movements of all extremities, full strength throughout, intact sensation, normal fine motion movements, and normal reflexes," all of which were inconsistent with Plaintiff's reported limitations. (Admin. R. at 38.) Moreover, the ALJ acknowledged a study of Plaintiff's lower limbs was normal and an orthopedic surgeon recommended only conservative treatment for Plaintiff's back. Because Plaintiff's testimony regarding the severity of her symptoms is not supported by various medical records and clinical findings, the ALJ did not err in identifying inconsistent medical evidence as a reason for discounting Plaintiff's testimony.

PAGE 21 - OPINION AND ORDER

II. Fibromyalgia

Plaintiff argues the ALJ failed to consider all evidence of Plaintiff's mental symptoms caused by her fibromyalgia in assessing Plaintiff's residual functional capacity and finding Plaintiff could return to past relevant work. Specifically, Plaintiff argues the ALJ did not consider Dr. Scharf's functional evaluation or the restrictions Dr. Leavitt noted in her December 2018 letter. Plaintiff argues, in essence, that the ALJ improperly rejected medical opinions related to her limitations with respect to concentration, persistence, and pace.

The weight attributable to the opinion of a medical source depends, in part, on the professional relationship between the physician and the claimant.[4]  Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than that of a physician who did not examine the claimant but formed an opinion based on a review of the claimant's medical records. *Holohan v. Massanari,* *246 F.3d 1195, 1201-1202 (9th Cir. 2001)*.

The ALJ can reject a treating or examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Thomas v.*

---

[4] For all claims filed on or after March 27, 2017, the regulations set forth in 20 C.F.R. § 404.1520c (not § 404.1527) govern. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c (2019). Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule. *See* 20 C.F.R. § 404.1520c. In this case, Plaintiff filed her claims for Benefits in January 2016, well before March 27, 2017. *See* 20 C.F.R. § 404.614 (defining when an application for benefits is considered filed). Thus, the court analyzes Plaintiff's claims utilizing § 404.1527 (providing the rules for evaluating opinion evidence for claims filed prior to March 27, 2017).

*Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An uncontradicted opinion may be rejected only for clear and convincing reasons. *Thomas*, 278 F.3d at 956-957.

The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996). It may constitute substantial evidence if it is consistent with other evidence in the record. *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989). Furthermore, an ALJ need not accept a physician's opinion that is brief, conclusory or inadequately supported by clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Plaintiff asserts Dr. Leavitt "reported" Plaintiff felt tired with little energy nearly every day, had difficulty concentrating more than half the time, and often experienced symptoms severe enough to interfere with her attention and concentration. First, the third statement was made in a letter dated December 2018 and considered by the Appeals Council, but not presented to the ALJ. Accordingly, the ALJ did not err in failing to mention or expressly reject Dr. Leavitt's statement in his October 22, 2018 opinion. Second, the first two statements were not opinions offered by Dr. Leavitt. The record establishes Dr. Leavitt merely listed complaints identified by Plaintiff during her January and June 2018 visits. The ALJ properly discounted Plaintiff's testimony regarding her symptoms and limitations and this finding applies equally to Dr. Leavitt's summary of Plaintiff's reported restrictions in concentration and attention.

The ALJ gave great weight to Dr. Scharf's opinion in finding Plaintiff was not limited in her ability to concentrate, persist, and maintain pace. The ALJ referred in detail to Dr. Scharf's described observations of Plaintiff during his examination, upon which Dr. Scharf found Plaintiff essentially normal. However, the ALJ did not expressly address Dr. Scharf's conclusion that Plaintiff "likely would have difficulties with persistence and her attention after 1 to 2 hours," which

PAGE 23 - OPINION AND ORDER

conclusion directly contradicts the ALJ's finding that Plaintiff had no limitations in her ability to concentrate, persist, or maintain pace. (Admin. R. at 764.) Furthermore, while the ALJ gave great weight to the mental assessments of Dr. Ju and Dr. Boyd in finding Plaintiff did not have a severe mental impairment, he ignored their conclusions that Plaintiff suffered mild difficulties in maintaining concentration, persistence, or pace. The ALJ effectively disregarded the opinions of an examining physician and two reviewing physicians by failing to recognize their stated limitations on concentration, persistence, pace, and attention in Plaintiff's residual functional capacity, and failed to provide any justification for such rejection.

The ALJ erred by disregarding the limitations identified by Dr. Scharf, Dr. Ju, and Dr. Boyd without providing any explanation. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (an ALJ errs by rejecting or assigning minimal weight to a medical opinion "while doing nothing more than ignoring it, asserting without explanation another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis" for such conclusion). Moreover, the ALJ failed to properly consider Plaintiff's non-exertional limitations unique to her fibromyalgia diagnosis as required by SSR 12-2p. As Judge Mosman in this district recently explained, SSR 12-2p imposes additional obligations on ALJ's in formulating limitations resulting from fibromyalgia in a claimant's residual functional capacity at steps four and five of the sequential evaluation:

> Some of the analysis at each step is unique for claimants with fibromyalgia. For example, in determining the [residual functional capacity] of a claimant with fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have "bad days and good days."' Similarly, at steps four and five, the ALJ has to consider whether the claimant has certain exertional, nonexertional, and environmental limitations that are unique to fibromyalgia, and that erode their ability to perform past relevant work or any other work in the national economy.

PAGE 24 - OPINION AND ORDER

*Helms Eddy v. Colvin,* No. 3:14-cv-01418-JE, 2016 WL 7013467, at *2 (D. Or. Nov. 28, 2016) (quoting SSR 12-2p *available* at 2012 WL 3104869).  Here, the ALJ failed to explain how he considered Plaintiff's non-exertional limitations, including her difficulty maintaining concentration, persistence, pace, or attention as a result of her fibromyalgia.  Consequently, the ALJ's formulation of Plaintiffs' residual functional capacity failed to include a proper evaluation of Plaintiff's mental limitations and is not supported by substantial evidence.

Finally, because the ALJ failed to provide specific and legitimate reasons for disregarding or discounting testimony of various physicians or explain how he evaluated Plaintiff's non-exertional limitations resulting from her fibromyalgia, the ALJ therefore failed to incorporate all of Plaintiff's limitations into her residual functional capacity.  Thus, the questions posed to Morrison were not based on substantial evidence and Morrison's answers are of no evidentiary value.  *Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) ("If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.").

III.  Remand

The decision whether to remand for further proceedings or for immediate payment of Benefits is within the discretion of the court.  *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000).  The issue turns on the utility of further proceedings.  A remand for an award of Benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed, and the evidence is insufficient to support the Commissioner's decision.  *Strauss v. Comm'r,* 635 F.3d 1135, 1138-39 (9th Cir. 2011) *(quoting Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)).  The court may

PAGE 25 - OPINION AND ORDER

not award Benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Strauss*, 635 F.3d at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of Benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connettv. Barnhart,* 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell,* 947 F.2d at 348*).* The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue,* 623 F.3d 1032, 1035 (9th Cir. 2010).

Here, Plaintiff concedes the proper course is to remand for further proceedings, and the court agrees. Further proceedings are required to reassess the medical evidence and allow the ALJ to accept the medical opinions Dr. Scharf, Dr. Ju, and Dr. Boyd and incorporate the limitations identified by those doctors into a new residual functional capacity or provide legally sufficient reasons for rejecting these opinions and limitations. On remand, the ALJ must evaluate Plaintiff's fibromyalgia as directed by SSR 12-2p and explain how the record regarding that impairment was considered in creating a new residual functional capacity, consider non-exertional limitations unique to fibromyalgia, and take new testimony from a vocational expert regarding Plaintiff's ability to perform work that exists in the national economy.

\ \ \ \ \

\ \ \ \ \

PAGE 26 - OPINION AND ORDER

*Conclusion*

The Commissioner erred in failing to offer specific reasons for rejecting medical opinions, properly consider Plaintiff's limitations resulting from her fibromyalgia, or elicit relevant testimony from the vocational expert on Plaintiff's ability to perform jobs in the national economy. Accordingly, the Commissioner's final decision is REVERSED and REMANDED for further proceedings consistent with this Opinion and Order.

DATED this 30th day of March, 2021.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 27 - OPINION AND ORDER